[Cite as *Foster v. Foster*, 2017-Ohio-4311.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Sherrie Foster [nka Tavtigian], | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 15AP-1157 |
| v. | : | (C.P.C. No. 09DR-0756) |
| Mark A. Foster, DDS, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on June 15, 2017

**On brief:** *Gary J. Gottfried Co., L.P.A., Gary J. Gottfried* and *Eric M. Brown,* for appellant. **Argued:** *Gary J. Gottfried.*

**On brief:** *The Nigh Law Group, LLC, Joseph A. Nigh* and *Courtney A. Zollars,* for appellee. **Argued:** *Joseph A. Nigh.*

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

HORTON, J.

{¶ 1} Plaintiff-appellant, Sherrie Foster (n.k.a. Tavtigian), appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, granting the motion of defendant-appellee, Mark A. Foster, to terminate spousal support and denying appellant's motion for expense money. For the reasons which follow, we affirm.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Appellant and appellee were married on November 29, 1986, and two children were born as issue of the marriage. The parties were divorced pursuant to an agreed judgment entry decree of divorce on October 2, 2009. The decree of divorce obligated appellee to pay appellant $6,500 per month in spousal support, and specified

that spousal support would terminate if any of the following events occurred: the death of either party; appellant's remarriage; appellant's cohabitation with an unrelated adult; or after 116 months of payments.

{¶ 3} On January 21, 2014, appellee filed a motion to terminate his spousal support obligation due to appellant's cohabitation with an unrelated adult. On July 30, 2014, appellant filed a motion for expense money, asking the court to order appellee to pay the out-of-pocket expenses and attorney's fees she incurred defending against the motion to terminate.

{¶ 4} On September 4, 2014, appellee filed the April 29, 2014 depositions of appellant and David Fleming, appellant's paramour. A magistrate of the domestic relations court held a hearing on the motion to terminate on September 8, 2014.

{¶ 5} Appellee is a dentist and appellant is a dental hygienist. During the parties' marriage, appellant worked as a hygienist in appellee's dental office. Fleming met appellant at the dental office in 2009 when he "was a patient in [her] chair." (Sept. 8, 2014 Tr. at 18.) Appellant and Fleming began dating a couple of days after they met, and have been in a committed, exclusive relationship with each other for the last three years.

{¶ 6} Appellant is currently employed by The Ohio State University ("OSU") as an administrative associate in the area of oral pathology. Appellant works over 40 hours a week, receives overtime, and has employer provided health insurance and a retirement plan. Fleming is a certified public accountant, and currently is the vice president and chief financial officer of Rod's Western World. In 2013, Fleming was the chief financial officer for housing and dining at OSU. Fleming has been married, and divorced, twice.

{¶ 7} Fleming and appellant both testified that they do not live together. In May 2012, appellant sold the marital residence and purchased a condominium located at Marblecliff Crossing Court in Columbus, Ohio. Fleming "looked at some homes" with appellant, and appellant used a real estate agent Fleming recommended to purchase the Marblecliff home. (Tr. at 48.)

{¶ 8} Fleming testified that he lives with his son, daughter-in-law, and their two children in a four bedroom house located in Marengo, Ohio. Fleming bought the Marengo property in January 2014, and "paid $115,000 down on that property," which was approximately half the purchase price. (Tr. at 108.) Because Fleming purchased half the

property outright, Fleming's son pays the entire monthly mortgage on the property. Prior to purchasing the Marengo home, Fleming owned a two-bedroom condominium located on Chatham Lane in Columbus, Ohio.

{¶ 9} Fleming testified that he goes to appellant's home after work "three to four" days a week, but stated that he doesn't "normally spend the night there." (Tr. at 75.) At his deposition, Fleming stated that he "[p]ossibly" spent more than half the nights in 2013 with appellant. (Fleming Depo. at 15.) At the hearing, Fleming stated that he "couldn't tell you" if he spent more than half the nights in 2013 with appellant. (Tr. at 92.)

{¶ 10} When appellee's counsel asked appellant if Fleming spent more than half the nights in 2013 with her, appellant said "no," and asserted, "[h]ow could I possibly know the answer to that question? I don't write it down. I don't keep a diary or a journal. Nobody asked me to keep track of it." (Tr. at 41.) At the hearing, appellant stated that she and Fleming spend "[p]robably an average of at least two" nights a week together. (Tr. at 41.) At her deposition, appellant had "[n]o idea" how many days in a month Fleming would stay the night with her, but knew that they had "been apart four or five days at least" per month. (Appellant Depo. at 44, 46.)

{¶ 11} Appellee hired a private investigator, Kevin Wolfe, to observe appellant and Fleming. On Monday June 3, Tuesday June 4, and Wednesday June 5, 2013, the investigator observed Fleming leave the Marblecliff residence around 7:00 a.m. each morning. On Monday June 17, Tuesday June 18, Wednesday June 19, and Friday June 21, 2013, the investigator again observed Fleming leave the Marblecliff residence around 7:00 a.m. each morning. Thereafter, the investigator observed the couple together at Marblecliff on seven different weekend nights.

{¶ 12} Wolfe attempted to look through appellant's trash at Marblecliff during the three weeks before the hearing; however, unlike all of the other residents in the neighborhood, appellant did not place any trash outside for removal during those weeks. Wolfe conducted surveillance at Fleming's Marengo home over the 30 days before the hearing, but did not observe Fleming at the Marengo home. Wolfe was able to collect trash from the Marengo residence, but did not find "any trash or documents related to David Fleming." (Tr. at 153.)

{¶ 13} On Thursday, June 13, 2013, Wolfe went to Fleming's Chatham Lane residence and knocked on the door. Case Kegley, who is the son of Fleming's good friend, answered the door. Wolfe and Case spoke for twenty minutes inside the Chatham Lane residence. Wolfe recorded the conversation, and the audio recording of the conversation was played during the hearing. Case informed Wolfe that he had "a 'special deal' with Mr. Fleming, including no lease and a rent payment of $500.00 per month," which was "designed to cover Mr. Fleming's mortgage payment." (Def.'s Ex. G.) Case informed Wolfe that Fleming "was moving out around the time that Case needed housing," that Fleming had moved "in with a woman that lived somewhere nearby within the Upper Arlington area," and that "his rental of the condo was really helping both of them out." (Def.'s Ex. G; Mag.'s Decision at 6.)

{¶ 14} At the hearing, Case stated that he lied to the investigator on June 13, 2013. Case testified that Fleming had not moved out, and that Fleming had lived with him at Chatham Lane. Case explained that he lied to Wolfe about Fleming moving out because he "just wanted [Wolfe] out of the place." (Tr. at 123.) However, Case admitted that he spoke with Wolfe for twenty minutes, did not ask him to leave at any point, and gave Wolfe both his phone number and Fleming's phone number.

{¶ 15} Appellant and Fleming have taken several vacations together. Between 2009 and 2014, they went to Mexico, California, Florida, South Carolina, Tennessee, Vermont, Italy, and New York. Fleming stated that "[q]uite frequently," they reimburse each other in cash for the expenses from their trips. (Tr. at 90.) The couple "spend the majority of [their] holidays together," including Thanksgiving and Christmas, and have attended work events together. (Tr. at 61-63.) Appellant stated that Fleming has given her "a couple sets of earrings, a necklace, a ring, [and] a computer" as gifts, and that she has given him "picture frames, binoculars, iPad, [and a] wool blanket." (Tr. at 65-66.)

{¶ 16} On April 24, 2015, the magistrate issued a decision granting appellee's motion to terminate spousal support and denying appellant's motion for expense money. The magistrate noted Case's testimony that he lied to the investigator, but observed that throughout the recorded conversation, Case was "quite comfortable, conversational and friendly with Mr. Wolfe. He freely invites Mr. Wolfe into the apartment and offers him Mr. Fleming's phone number." (Mag.'s Decision at 5.) The magistrate found Case's in

court testimony to be "deliberately evasive, forgetful, and just not credible at all." (Mag.'s Decision at 6.) The magistrate noted that appellant and Fleming were both quite "vague" regarding how much time they would spend, and concluded that their testimony was "self-serving, tailored to mislead the court, and completely disingenuous." (Mag.'s Decision at 7.) The magistrate reviewed the evidence, and concluded that appellant and Fleming were cohabitating.

{¶ 17} Appellant filed objections to the magistrate's decision on May 1, 2015, objecting to the magistrate's conclusion that she and Fleming were cohabitating and to the magistrate's reliance on *State v. McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85. Appellant supplemented her objections on July 7, 2015, asserting that the magistrate improperly applied the law from *McGlothan* and that the magistrate erred by failing to award appellant legal fees.

{¶ 18} On December 4, 2015, the trial court issued a decision and entry overruling appellant's objections and adopting the magistrate's decision. The court found no error in the magistrate's conclusion that appellant and Fleming were cohabitating, and specifically found competent, credible evidence demonstrating that appellant and Fleming had lived together, for a sustained duration, and that they shared expenses. The court observed that the magistrate relied on applicable precedent to find cohabitation, and concluded that "[a]ny application of *McGlothan* [was] harmless." (Decision at 17.) The court found no error in the magistrate's denial of appellant's request for legal fees.

## II. ASSIGNMENTS OF ERROR

{¶ 19} Appellant appeals, assigning the following errors for our review:

> [I.]  The trial court's determination that appellant had cohabitated with an unrelated adult male for purposes of terminating spousal support under the parties' divorce decree was not supported by competent, credible evidence.
>
> a.  The trial court's determination that appellant actually lived together with an unrelated adult male was not supported by competent, credible evidence.
>
> b.  The trial court's determination that appellant and an unrelated adult male resided together for

a sustained duration was not supported by competent, credible evidence.

c. The trial court's determination that appellant and an unrelated adult male shared expenses with respect to financing and daily incidental expenses was not supported by competent, credible evidence.

[II.] The trial court erred and abused its discretion in applying domestic violence precedent regarding cohabitation in the context of a domestic relations spousal support case.

[III.] The trial court erred and abused its discretion in failing to award any legal fees to appellant.

## III. FIRST ASSIGNMENT OF ERROR—COHABITATION

{¶ 20} Appellant's first assignment of error asserts that the trial court's conclusion that she and Fleming were cohabitating is not supported by competent, credible evidence.

{¶ 21} Civ.R. 53 governs proceedings before a magistrate, including objections to a magistrate's decision. Civ.R. 53(D)(4)(d) provides that "[i]f one or more objections to a magistrate's decision are timely filed, the court shall rule on those objections." In ruling on objections to a magistrate's decision, the trial court must undertake an independent review of the matters objected to in order "to ascertain [whether] the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d). The trial court has the "ultimate authority and responsibility over the [magistrate's] findings and rulings." *Hartt v. Munobe*, 67 Ohio St.3d 3, 5 (1993).

{¶ 22} Cohabitation, for spousal support purposes, is a question of fact for the trier of fact. *Hupp v. Hupp*, 10th Dist. No. 14AP-755, 2015-Ohio-3594, ¶ 8. " '[I]f the trial court's decision is supported by some competent, credible evidence going to all the essential elements of the issue, it will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Id.*, quoting *Fuller v. Fuller*, 10 Ohio App.3d 253, 254 (10th Dist.1983). *See also Thurston v. Thurston*, 10th Dist. No. 99AP-741 (Apr. 20, 2000); *Shunk v. Shunk*, 7th Dist. No. 03 BE 62, 2004-Ohio-7060, ¶ 26. "The burden of proof of cohabitation is upon the moving party." *Barclay v. Barclay*, 10th Dist. No. 97APF07-902 (Dec. 11, 1997).

{¶ 23} "The purpose of spousal support is to provide for the financial needs of the former spouse." *Barclay*, citing *Moell v. Moell*, 98 Ohio App.3d 748, 751 (6th Dist.1994). If the former spouse "is living with another person to the extent that the other person provides support or is supported, then the underlying need for [spousal support] is reduced or does not exist." *Thomas v. Thomas*, 76 Ohio App.3d 482, 485 (10th Dist.1991). Thus, "cohabitation, in the legal sense, implies that some sort of monetary support is being provided by the new partner or for the new partner. Without a showing of support, merely living together is insufficient to permit a termination of [spousal support]." *Thomas* at 485, citing *Bussey v. Bussey*, 55 Ohio App.3d 117 (12th Dist.1988).

{¶ 24} Accordingly, cohabitation "describes an issue of lifestyle, not a housing arrangement." *Moell* at 752. In *Moell*, the court refused to terminate the ex-wife's spousal support despite the fact that she was living with her fiancé. The ex-wife had suffered a debilitating stroke, and her fiancé moved in to assist with her daily living needs. The parties "both testified that, but for appellee's stroke, they would not be living together," and the couple "maintained separate finances" despite their living arrangement. *Id.* at 750-51.

{¶ 25} In *Barclay*, this court relied on the *Moell* court's analysis of cohabitation, and stated that a trial court should look to the following three factors to determine cohabitation: (1) an actual living together; (2) of sustained duration; and (3) a sharing of expenses. A court should also consider other relevant criteria, such as the behavior and intent of the parties. *Barclay*, citing *Moell*.

{¶ 26} In *Barclay,* this court further observed that in *State v. Williams*, 79 Ohio St.3d 459 (1997), "the Supreme Court of Ohio stated the essential elements of cohabitation within the context of R.C. 2919.25," domestic violence, were "(1) sharing of familial or financial responsibilities and (2) consortium." *Barclay*, citing *Williams* at paragraph two of the syllabus. Although *Williams* "involved the criminal offense of domestic violence," we found the analysis of cohabitation "instructive to our decision" in *Barclay*. Following *Barclay*, this court again relied on both the *Williams* and the *Moell* definitions of cohabitation in *Thurston* and *Hupp*.

*1. Actual living together*

{¶ 27} Appellant asserts that there is no evidence demonstrating that she and Fleming live together, as she lives at Marblecliff and Fleming lives in Marengo. Appellant asserts that neither she nor Fleming leave "personal belongings at the other person's residence," that Fleming does "not have a key to [her] residence," and that Fleming "does not take out the trash" at her residence. (Appellant's brief at 16.) The evidence contradicts appellant's assertions.

{¶ 28} Appellant admitted that she and Fleming used to keep clothing and personal affects at each others' residences, and stated that they coincidentally stopped this practice for "[n]o reason" when appellee filed the motion to terminate. (Tr. at 67.) At his deposition, Fleming admitted that he kept "[a] few" articles of clothing at Marblecliff. (Fleming Depo. at 29.)

{¶ 29} Although Fleming does not have a key to appellant's house, he has had a garage door opener to her home for "a significant amount of time." (Tr. at 49.) Fleming can access the Marblecliff home "whenever he wants," and "has been in [appellant's] home when [she is] not there." (Tr. at 49.) Fleming also receives mail at Marblecliff. Appellant stated that Fleming "has only received mail at [her] residence on a few occasions," and explained that he began receiving mail at Marblecliff "within the last two years." (Tr. at 21.)

{¶ 30} "[R]arely," Fleming does take out the trash at Marblecliff. (Tr. at 101.) Fleming admitted that he does household chores at Marblecliff, including cleaning, vacuuming, and doing dishes, although he doesn't do them "very often." (Tr. at 102.) Fleming and appellant will "occasionally" go grocery shopping together and purchase food items to keep at Marblecliff. (Tr. at 103.) Fleming has purchased cases of wine and brought them to Marblecliff for the couple to consume together. (Tr. at 64.) Fleming stored his corvette in the garage at Marblecliff "for a few months at the end of 2013." (Tr. at 51.)

{¶ 31} Fleming does "some" general upkeep and repairs at Marblecliff, he has "fixed some faucets and those type of things." (Tr. at 98; Fleming Depo. at 36.) Fleming installed hardwood floors at Marblecliff. Although appellant testified that the floors were "a gift," appellant did not include hardwood floors in the list of gifts she has received from

Fleming. (Tr. at 50, 65.) Fleming also installed tile flooring in one of the bathrooms at Marblecliff.

{¶ 32} Furthermore, Case informed Wolfe in June 2013 that "Mr. Fleming had moved out and moved in with his girlfriend in Upper Arlington." (Tr. at 146-47.) The trial court acknowledged Case's testimony recanting his June 2013 statement, but deferred to the magistrate's first-hand observation describing Case's testimony as deliberately evasive, forgetful, and just not credible at all. Appellant argues that it is "difficult to reconcile how the court can assert that the testimony of [Case] was not credible at one point but conclude that he was at another time when the court was unable to observe his demeanor, temperament, etc." (Appellant's brief at 19.) Appellant notes that Case also told Wolfe during their June 2013 conversation that he was a graduate student at OSU, but testified at the hearing that he has never attended OSU. (*See* Tr. at 136.)

{¶ 33} An appellate court must give deference to the trier of facts' evaluation of the evidence and the credibility of witnesses. *Thurston*, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). *See also State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflections, and gestures." *Wilson v. Wilson-Michelakis*, 10th Dist. No. 09AP-81, 2010-Ohio-370, ¶ 17, citing *Seasons Coal Co.* at 80. *See also Ahmmad v. Ahmed*, 10th Dist. No. 14AP-736, 2015-Ohio-2537, ¶ 38 (noting that a witnesses' demeanor, gestures, and voice inflections "cannot be conveyed on appeal through the written record"). "It is the province of the fact finder to determine the truth from conflicting evidence, whether the conflicting evidence comes from different witnesses or is contained within the same witness's testimony." *State v. Eisenman*, 10th Dist. No. 10AP-809, 2011 Ohio 2810, ¶ 19.

{¶ 34} As the magistrate was in the best position to evaluate Case's credibility, we defer to the magistrate's evaluation of Case's testimony as lacking credibility. In addition to observing Case's testimony, the magistrate also observed Wolfe testify regarding the June 2013 conversation with Case. Wolfe affirmed that it did not "appear to [him that] during [his] interview that Case was giving [him] false information." (Tr. at 145-46.) Wolfe stated that Case appeared comfortable during their conversation, noting that Case

"invited me in his home" where they spoke for twenty minutes while "sitting on the couch inside his family room." (Tr. at 146.)

{¶ 35} As the trier of fact, the magistrate was entitled to "believe all, part, or none" of the witnesses' testimonies. *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21. Accordingly, the magistrate was entitled to disbelieve Case's testimony that he had lied to Wolfe in 2013, while believing Wolfe's testimony that Case appeared truthful in stating that Fleming had moved in with appellant. Furthermore, Wolfe's observations of Fleming leaving appellant's residence on consecutive weekday mornings in June 2013 corroborated Case's statement that Fleming had moved in with appellant.

{¶ 36} Fleming had unfettered access to the Marblecliff home. He received mail there, bought groceries and wine for the household, did household chores, repairs, and made renovations to the home. Moreover, Case informed Wolfe that Fleming had moved in with appellant. Accordingly, there was competent, credible evidence supporting the trial court's conclusion that appellant and Fleming lived together.

*2. Sustained duration*

{¶ 37} Appellant argues that the trial court "found only that appellant and Fleming were 'in an intimate relationship' for a sustained duration," but did not find "that appellant and Fleming had actually *resided* together for a sustained duration." (Emphasis sic.) (Appellant's brief at 21.) To the contrary, the trial court found that appellant and Fleming had "lived together for a sustained duration or at the very least from June 2013 to January 2014." (Decision at 13.) Although the magistrate stated that appellant and Fleming had been "in an intimate relationship of sustained duration," (Magistrate's Decision at 12), the trial court found that appellant and Fleming had lived together for a sustained duration. "Claims of error by the trial court must be based on the trial court's actions, rather than on the magistrate's findings." *Forester v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-366, 2011-Ohio-6296, ¶ 6, citing *Mayle v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-541, 2010-Ohio-2774, ¶ 15.

{¶ 38} The trial court found "[e]vidence of sustained duration * * * contained within Mr. Wolfe's report," as the report "identified Mr. Fleming coming or going, especially in the mornings, from [appellant's] condo almost daily in June 2013," and Case informed Wolfe that "Mr. Fleming went to *move in* with his girlfriend [appellant] around

June of 2013." (Emphasis sic.) (Decision at 12.) Noting that the couple used to leave clothes at each other's residences, but "immediately ceased doing so after Defendant filed his *Motion to Terminate Spousal Support* in January 2014," the court concluded that the couple lived together from at least June 2013 to January 2014. (Decision at 13.) *See Hupp* at ¶ 10 (finding that appellant and her paramour lived "at the Taylor Lane property for a period of at least five months, thus satisfying the requirements of actual living together for a sustained duration").

{¶ 39} Appellant asserts that the "dates settled upon by the trial court in the *Decision* are based upon hearsay (subsequently retracted by the declarant in sworn testimony) and circumstantial evidence." (Appellant's brief at 20.) Appellant, however, failed to object on the basis of hearsay when Case's statement to Wolfe was introduced at the hearing. (*See* Tr. 124-31; 146-47.) "Where no objection is raised to hearsay evidence, it may be considered by the trier of fact for whatever probative value it may have." *State v. Scott*, 10th Dist. No. 05AP-1144, 2006-Ohio-4981, ¶ 19, citing *Dudukovich v. Lorain Metro. Hous. Auth.*, 58 Ohio St.2d 202, 208 (1979). *See also Lord v. Lord*, 8th Dist. No. 89395, 2008-Ohio-230, ¶ 56.

{¶ 40} Furthermore, circumstantial evidence and direct evidence inherently possess the same probative value. *State v. Fielding*, 10th Dist. No. 13AP-654, 2014-Ohio-3105, ¶ 52. *See also State v. Nicely*, 39 Ohio St.3d 147 (1988), quoting Black's Law Dictionary 221 (5th Ed.1979) (noting that "[c]ircumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved' "). Wolfe's observations and his conversation with Case in June 2013, and the filing of the motion to terminate in January 2014, provided the court with competent and credible circumstantial evidence demonstrating that appellant and Fleming lived together from at least June 2013 to January 2014.

{¶ 41} Accordingly, the evidence supported the trial court's conclusion that appellant and Fleming lived together for a sustained duration.

*3. Shared expenses*

{¶ 42} Appellant asserts that there is no evidence supporting the trial court's conclusion that she and Fleming shared expenses. Appellant states that she and Fleming

have "no financial entanglement," as they do not have joint credit cards or bank accounts. (Appellant's brief at 23.) However, "[p]roof of shared expenses does not have to be by direct evidence alone, but can be established by circumstantial evidence." *Bickham v. Bickham*, 5th Dist. No. 11-CA-9, 2011-Ohio-4213, ¶ 24.

{¶ 43} Regarding the couple's vacations together, the court observed that "the couple was comingling funds on vacation to such a degree that [appellant] could not recall or produce records of who paid for what, when." (Decision at 14.) The evidence supports the trial court's conclusion.

{¶ 44} For instance, appellant and Fleming attended the Rose Bowl in Pasadena, California in 2010. Although appellant couldn't "remember exactly who put the air tickets on their credit card," she stated that "when [they] travel, [they] always reimburse, like, if one person pays for the ticket, [one] might pay them back for the ticket or pay back something else to make it relatively equal." (Tr. at 27.) However, appellant could not recall who reimbursed who for the Rose Bowl trip, and admitted that she did not have any record of either the payment or reimbursement from that trip. (Tr. at 28.) In 2011, appellant accompanied Fleming to a work conference in Orlando, Florida. Appellant stated that she "paid for [her] own ticket and [her] own meals" in Orlando, but then stated that she could not "remember who paid for dinner, but we usually did make things very even." (Tr. at 29.) Appellant and Fleming went to the Florida Keys in 2012 with another couple. Appellant stated that her "friend Sandy paid for" the place, and that she and Fleming "reimbursed her" then "divided up the rest between the two of us." (Tr. at 30.) Appellant had no record of the payment to her friend or of the reimbursement between herself and Fleming. (Tr. at 31.)

{¶ 45} Appellant and Fleming went to Hilton Head, South Carolina in 2012 and Fleming "picked up most of" the expenses of that trip. (Tr. at 30.) In 2013, the couple went to Italy for a week. Appellant paid for the rental car in Italy, and converted $1,000 into Euros which she used "on the trip for [her] and [Fleming's] expenses." (Tr. at 34.) Appellant also stated that she "used [her] credit card a couple times at the end of the trip and so did [Fleming]." (Tr. at 70.) At her deposition, appellant stated that Fleming paid to take her son on a fishing trip to Canada, but at the hearing, appellant stated that she had

paid for her son's portion of the Canada trip. Appellant had no record of this payment, noting "I'm sure I gave him cash." (Tr. at 37.)

{¶ 46} Appellant asserts that "appellee was unable to produce any evidence – circumstantial or otherwise – that appellant and Fleming did not in fact reimburse each other for travel expenses." (Appellant's brief at 24-25.) However, the evidence demonstrates that for some of the trips, the couple did not attempt to reimburse each other: Fleming paid for Hilton Head, and appellant provided the spending cash and the car for Italy. Moreover, for the trips where appellant testified that they did reimburse each other, appellant was unable to produce any record of these reimbursements to corroborate her testimony. The trier of fact was under no obligation to believe appellant's testimony that she and Fleming reimbursed each other for travel expenses. *Raver* at ¶ 21.

{¶ 47} Appellant and Fleming have made significant cash purchases from each other. Fleming bought a new 2012 Honda CRV in July 2012 for $27,833.69, and transferred it to appellant one and one-half years later for a recorded "sale price of zero dollars." (Decision at 15.) Appellant wrote Fleming a $23,475.25 check for the CRV on November 23, 2013. Appellant testified that she paid Fleming "$25,000 for that car," explaining that she "took out money" from the purchase price "that [Fleming] owed [her]" for a Christmas gift. (Tr. at 53.) Also in 2013, appellant transferred her Ford Focus to Fleming. Fleming did not pay appellant for the vehicle because he was "test driving it to potentially purchase it." (Tr. at 101.) Fleming subsequently sold the car "to CarMax and [he] gave [appellant] the proceeds." (Tr. at 101.)

{¶ 48} On December 23, 2013, appellant purchased Fleming's Chatham Lane condo for $90,000. The couple did not use a realtor to process the transaction. Fleming confirmed that the $90,000 from Chatham Lane "[e]ssentially it went into the Marengo property." (Tr. at 108.) The court observed that Fleming's down payment on the Marengo home was "almost the exact amount of money based on [appellant] buying [Fleming's] Chatham Lane residence and vehicle." (Decision at 16.)

{¶ 49} Appellant and Fleming also shared day-to-day expenses. Fleming bought groceries and wine for the couple to share at Marblecliff, and appellant and Fleming "take turns buying meals" when they go out to eat. (Tr. at 63-64.) Fleming is on appellant's cell phone plan, and appellant stated that Fleming pays her $50 a month "in cash" for his

portion of the bill. (Tr. at 197.) Fleming has fixed faucets and installed hardwood and tile flooring at Marblecliff. Fleming admitted he was not paid to install the tile floors at Marblecliff, noting that he installed the tile just "for improvement of the home." (Tr. at 98.)   *Compare Laveer v. Laveer*, 5th Dist. No. 12 CAF 12 0086, 2013-Ohio-3294, ¶ 42 (finding "no evidence of financial assistance to establish cohabitation," as the paramour "did not purchase any items for appellee's new home"); *Hupp* at ¶ 11 (finding evidence of shared expenses as the paramour "purchased paint, lawn supplies, carpet, and a refrigerator for the Taylor Lane property"). Fleming has also assisted appellant with preparing and filing her tax returns over the last few years.

{¶ 50} Thus, the couple comingled funds on their trips, Fleming used his own funds and efforts to make improvements to the Marblecliff home, Fleming was on appellant's cell phone plan, and the couple shared the expenses of eating and drinking. The couple's strategic cash purchases from each other financed Fleming's down payment on the home in Marengo. Accordingly, we find competent, credible evidence establishing that appellant and Fleming shared expenses with respect to financing and day-to-day expenses.

{¶ 51} Since there is competent and credible evidence in the record demonstrating that appellant and Fleming were cohabitating, the judgment is not against the manifest weight of the evidence. Based on the foregoing, appellant's first assignment of error is overruled.

## IV. SECOND ASSIGNMENT OF ERROR—DOMESTIC VIOLENCE CASE LAW

{¶ 52} Appellant's second assignment of error asserts that the trial court erred by applying domestic violence case law to the cohabitation dispute in the instant case. The trial court, however, found cohabitation established pursuant to the three *Moell* factors. (*See* Decision at 5-17.) Pursuant to our analysis of appellant's first assignment of error, we have also found cohabitation established pursuant to the *Moell* factors. Accordingly, cohabitation has been established.

{¶ 53} The magistrate noted both the *Moell* and *Williams* factors for cohabitation, and observed that in *Thurston,* "the Tenth District cited the above cases with approval." (Magistrate's Decision at 12.) The magistrate further noted that the Supreme Court of Ohio had recently revisited the *Williams* holding in *McGlothan*. In *McGlothan*, the

defendant and victim had lived together for one year. Accordingly, because the couple lived together, the "state had no obligation to demonstrate the sharing of familial or financial responsibilities and consortium to prove cohabitation in [the] case." *Id.* at ¶ 15. Although the magistrate noted *McGlothan*, the magistrate reviewed the evidence and found cohabitation established based on the "evidence that these parties actually reside together," and the "direct evidence of financial intermingling and strong circumstantial evidence of shared financial responsibilities." (Magistrate's Decision at 12-13.)

{¶ 54} The trial court overruled appellant's objections to the magistrate's decision, and expressly held that "[a]ny application of *McGlothan* was a harmless error." (Decision at 18.) As cohabitation has been established pursuant to the *Moell* factors in the instant case, any citation in the court below to *McGlothan* was harmless error.

{¶ 55} Based on the foregoing, appellant's second assignment of error is overruled.

## V. THIRD ASSIGNMENT OF ERROR—LEGAL FEES

{¶ 56} Appellant's third assignment of error asserts that the trial court abused its discretion by failing to award appellant legal fees.

{¶ 57} "[A] party is not entitled to attorney's fees; rather, the trial court decides on a case-by-case basis whether attorney's fees would be equitable." *Cryder v. Cryder*, 10th Dist. No. 07AP-546, 2008-Ohio-26, ¶ 34. A trial court's decision whether to award attorney's fees is within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion. *Georgenson v. Georgenson*, 10th Dist. No. 03AP-390, 2003-Ohio-7163, ¶ 19; *Epitropoulos v. Epitropoulos*, 10th Dist. No. 10AP-877, 2011-Ohio-3701, ¶ 42. "The party seeking attorney's fees has the burden of proving the reasonableness of the fees." *Falk v. Falk*, 10th Dist. No. 08AP-843, 2009-Ohio-4973, ¶ 39, citing *Groza-Vance v. Vance*, 162 Ohio App.3d 510, 2005-Ohio-3815 (10th Dist.)

{¶ 58} R.C. 3105.73(B) provides that, "[i]n any post-decree motion or proceeding that arises out of an action for divorce, * * * the court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable." In determining whether an award is equitable, "the court may consider the parties' income, the conduct of the parties, and any other relevant factors the court deems appropriate, but it may not consider the parties' assets." *Id.* Thus, R.C. 3105.73(B) allows a court to consider the parties' income and conduct, but does not require the court to

make such findings. *See Padgett v. Padgett*, 10th Dist. No. 08AP-269, 2008-Ohio-6815, ¶ 13.

{¶ 59} At the hearing, appellant testified that her attorney charged her $250 an hour and that she had paid him "$11,000" noting, "I know I have a credit." (Tr. at 202.) Appellant presented her bill from her attorney as an exhibit. The exhibit demonstrates that, as of September 3, 2014, appellant's bill totaled $8,649.90 and she had provided a retainer of $10,750. (*See* Pl.'s Ex. No. 1.)

{¶ 60} The magistrate denied appellant's motion for expense money without discussing the issue. Civ.R. 53(D)(3)(a)(ii) provides that "a magistrate's decision may be general unless findings of fact and conclusions of law are timely requested by a party." "[I]f a magistrate has not prepared findings of fact * * *, the burden is on the party objecting to request findings of fact from the magistrate pursuant to Civ.R. 52 and Civ.R. 53(D)(3)(a)(ii)." *Casper v. Casper*, 12th Dist. No. CA2012-12-128, 2013-Ohio-4329, ¶ 39. Appellant did not file a request for findings of fact or conclusions of law pursuant to Civ.R. 53(D)(3)(a)(ii).

{¶ 61} Appellant objected to the magistrate's denial of her request for legal fees, and the trial court overruled her objection. The court noted R.C. 3105.73(B), and observed that while it could consider the parties' income and conduct, appellant had failed to present any evidence "outside of Plaintiff's *Exhibit 1* and her very brief testimony as to its contents." (Emphasis sic.) (Decision at 19.)

{¶ 62} Appellant argues that the "trial court did not provide for a discussion on considerations of equity," and asserts that the court failed to address "the income disparity that exists between the parties here, nor is there discussion of the litigation expense increase brought about by the abundant discovery." (Appellant's brief at 37-38.) Appellant, however, failed to present the court with any evidence regarding the income disparity between the parties or appellee's conduct during discovery. Appellant failed to demonstrate that an award of attorney's fees would be equitable in the instant case.

{¶ 63} Upon review, we find no abuse of discretion in the trial court's decision denying appellant's request for legal fees. Based on the foregoing, appellant's third assignment of error is overruled.

## VI. CONCLUSION

{¶ 64} Having overruled appellant's first, second, and third assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations.

*Judgment affirmed.*

DORRIAN and BRUNNER, JJ., concur.

————————————